**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| KAREN LYNETTE RAINEY,<br><br>Plaintiff,<br><br>v.<br><br>SAFETY HOLDINGS, INC. d/b/a SAMBASAFETY,<br><br>Defendant. | **Case No.:** 3:26-3526-SAC<br><br>**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL** |

Karen Lynette Rainey ("Plaintiff" or "Ms. Rainey") by and through her counsel brings the following Complaint against Safety Holdings, Inc. D/b/a SambaSafety ("Defendant" or "Safety") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of an background check report, specifically a Motor Vehicle Report ("MVR"), that Defendant published to Uber, which included an expired license note which belonged to a completely different consumer, but cost her ability to drive for Uber.

## INTRODUCTION

1. This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2. Defendant is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports generated from its database and furnishes these consumer reports to employers who use the reports to make decisions regarding whether to offer employment to certain consumers.

3. Defendant falsely reported to Uber, that Plaintiff's personal driver's license was EXPIRED in 2005, making her ineligible to work for Uber. Defendant's reporting is grossly inaccurate and untrue.

4. However, Plaintiff's driver's license was and is still valid.

5. The expired license note on Plaintiff's MVR belongs to a consumer with a different name, birth date, and address. This notation appeared on Plaintiff's MVR for no apparent reason.

6. The personal identifying information on the face of the MVR published by Defendant about Plaintiff contained obvious discrepancies; in fact, none of the personally identifiable information reported actually matched Plaintiff's personal information.

7. Uber suspended/deactivated Plaintiff's Uber account after receiving a background check report from Defendant, which erroneously showed that Plaintiff did not have an active, valid driver's license.

8. Defendant's inaccurate reporting could have easily been avoided had Defendant performed a cursory review of the widely available South Carolina Department of Motor Vehicle ("SCDMV") records about Plaintiff prior to publishing Plaintiff's report to her employer, Uber.

9. Had Defendant performed even a cursory review of the SCDMV records, it would have discovered that Plaintiff's personal driver's license was never expired. Rather, Defendant reported the expired license of a completely different consumer with a different name, birth date, and address.

10. Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ

reasonable procedures resulted in Plaintiff's report being grossly inaccurate and containing information belonging to a completely unrelated consumer.

11. Defendant has no procedures to verify that the personal identifying information it publishes about a consumer's SCDMV record actually matches the personal identifying information of the consumer who is the subject of the report.

12. Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking employment by prejudicing their prospective or current employers with inaccurate motor vehicle record information.

13. Defendant's inaccurate report cost Plaintiff a good paying, flexible job with Uber, with whom she had been working for almost 7 years.

14. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of income, loss of employment opportunities, wages, and benefits; loss of economic opportunities; loss of time and money trying to correct her background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

15. As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA, and for failing to conduct a reasonable reinvestigation to determine whether the information Plaintiff disputed - the expired status of her driver's license - was inaccurate and should be corrected in the subject consumer report, in violation of the FCRA, 15 U.S.C. § 1681i.

## PARTIES

16. Karen Lynette Rainey ("Plaintiff" or "Ms. Rainey") is a natural person residing in West Columbia, SC, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

17. Defendant Safety Holdings, Inc., d/b/a SambaSafety ("Defendant" or "SambaSafety") is a Delaware corporation doing business throughout the United States, including the State of South Carolina and in this District, and has a principal place of business located at 100 Sun Avenue NE Suite 650, Albuquerque, NM 92590 and can be served at its registered agent at CT Corporation System, 206 S. Coronado Ave., Espanola, NM 87532.

18. Among other things, Defendant sells background check reports, including Driver Record Reports, to online service platforms like Uber for their use in deciding whether to offer its platform and range of services to potential consumers looking to offer its services, such as in this case, transportation services.

19. These reports are provided for the purpose of evaluating a consumer for employment such that they may offer their driving services on the Uber platform to earn income.

20. Further, these reports are also provided in connection with a business transaction initiated by the consumer.

21. Defendant is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for employment purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

22. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

24. Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

25. While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

26. Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

27. Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

## THE FCRA'S PROTECTIONS FOR JOB APPLICANTS

28. Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates employment background check reports like the one Defendant prepared in Plaintiff's name.

29. The FCRA provides a number of protections for job applicants who are the subject of background checks for purposes of securing employment, housing, and other purposes.

30. In the parlance of the FCRA, background checks are "consumer reports," and providers of background checks, like Defendant, are "consumer reporting agencies." 15 U.S.C. §§ 1681a(d) and (f).

31. The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

32. Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

33. Defendant disregarded its duties under the FCRA with respect to Plaintiff's background check report.

## DEFENDANT'S ILLEGAL BUSINESS PRACTICES

34. Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data. As a result of the increasing availability of this data, there has been a boom in the background check industry.

35. As summarized in a recent report by the Consumer Financial Protection Bureau, a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening.

36. The background check industry takes in revenues in excess of three billion dollars, annually.

37. Background checks are generally created by running automated searches through giant databases of aggregated public record data. The reports are created and disseminated with little to no manual, in-person review, and the underlying records are rarely directly reviewed in creating background checks.

38. Background check companies, like Defendant, collect, among other things, countless motor vehicle records ("MVRs") from a number of sources with data from county, state, and federal level sources.

39. Given that Defendant is in the business of selling background checks, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

40. Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to Defendant's customers.

41. Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

42. Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

43. Appropriate quality control review of Plaintiff's report would have made clear that Defendant's reporting that Plaintiff had an expired driver's license was completely inaccurate.

44. As a provider of background check reports, Defendant should be aware of the FCRA requirements and is a member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

45. As a provider of background check reports, Defendant should be aware of the FCRA requirements and is a member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## <u>FACTS</u>

### Plaintiff's Work with Uber

46. Plaintiff had been driving with Uber for approximately six to seven years without any prior issues related to her account, driver's license, or driving record.

47. Although Plaintiff has a full-time job outside of Uber working for the State of South Carolina, she relies heavily on the income she is able to earn from Uber to survive and pay all her expenses.

48. Plaintiff is one of thousands, if not tens of thousands, in a similar situation. The gig economy is an economic lifeline.

**Plaintiff's Deactivation by Uber**

49. Prior to March 2026, Uber contracted with Defendant to provide MVRs as part of its policies and procedures for existing and new drivers.

50. On March 1, 2026, Uber ordered Plaintiff's Motor Vehicle Record ("MVR") from SambaSafety as part of their usual procedures.

51. On March 1, 2026, SambaSafety published an MVR to Uber.

52. On or around March 1, 2026, Plaintiff's Uber account was suddenly deactivated due to an alleged "expired license." However, Plaintiff's license remained active and valid during this time and all relevant times she worked with Uber.

53. Plaintiff became aware of the inaccurate reporting issue after she received a background check report from SambaSafety.

54. Upon reviewing the report, Plaintiff discovered that the report contained information belonging to an entirely different individual from *North* Carolina (not South Carolina), including a different name, address, and date of birth:

```
          SambaSafety                   NORTH CAROLINA DRIVER RECORD REPORT

REPORT SEARCH DATE -> 03/01/2026

----------------------
DISPOSITION: EXCEPTION
----------------------

LICENSE NAME/ADDRESS                    DRIVER DESCRIPTION
------------------------------          --------------------------------------
  NOVAK, MARGARET CLARKE                  D.O.B.    |SEX| HGT |RACE|  SOC.SEC
  [redacted] KAPLAN DR                  ==========|===|=====|====|=========
  RALEIGH, NC. 27606-2522               [redacted]/1970| F |507  |    |

REPORT PREPARED FOR
------------------------------          --------------------------------------
  UBER LHD                                COMMENT:
                                          POLICY #: 58F2D3D4-DBDB-485B-B250-1421C67C9B46
  1515 3RD STREET                         REQUESTOR: UBER LHD
  SAN FRANCISCO, CA. 94158                CHARGED TO ACCOUNT: V5698


LICENSE NUMBER -> [redacted]9313

ORIG.ISSUED   ISSUED     EXPIRES    CLASS                        STATUS
----------- ---------- ---------- ---------------------- ----------------------
12/31/1986  11/25/1998 10/13/2005 C                             EXPIRED
--------------------------------------------------------------------------------

LICENSE TYPE: PERSONAL
CLASS DESCRIPTION: C - SINGLE VEH < 26K
STATUS DESCRIPTION: EXPIRED
RESTRICTIONS:
ENDORSEMENTS:

CDL ISSUED:              CDL STATUS:

POINTS: 0
REINST DATE:
SECONDARY LIC:
OTHER STATE LIC:
OTHER STATE:
NON - RESIDENT MILITARY:
BOATCLASS:

Alert: Requested Last Name (RAINEY) did not match.
Alert: Requested First Name (KAREN) did not match.
Alert: Requested DOB ([redacted]/1963) did not match.
```

55. The report itself even indicated that the last name, first name, and date of birth did not match.

56. A cursory review of the widely available public court records confirms that *this is not Plaintiff's record.* The discrepancies are obvious on the face of the report.

57. Plaintiff is from South Carolina. Plaintiff lives and drives for Uber in South Carolina. Plaintiff has never had a license from North Carolina.

58. Plaintiff's date of birth is in 1963 and the report is about a person born in 1970.

59. Nether the first nor last names match.

60. The sole reason Plaintiff's license was reported as expired was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the consumer report it sold about Plaintiff to Plaintiff's prospective employer.

61. Defendant has no procedures which flag a review of a consumer report before publishing it to its customer Uber when the personal identifying information of the person returned **does not match any** of the personal identifying information of the subject of the report.

62. Had Defendant followed reasonable procedures, it would have discovered that Plaintiff's license was perfectly active and would not have reported the same.

63. In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Plaintiff's prospective employer inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff Tries to Correct the Inaccurate Report**

64. After discovering the error, in or around March 2026, Plaintiff immediately took steps to address the inaccuracies with her MVR. She needed to continue driving for Uber to make ends meet.

65. Plaintiff uploaded a copy of her valid driver's license to Uber once again and sent a message direct to Uber explaining that the background check report was inaccurate and contained information that did not belong to her.

**Plaintiff Disputes the Inaccurate Report with Defendant**

66. After not receiving a response from Uber, on March 15, 2026, Plaintiff also disputed the report directly with SambaSafety via email.

67. Plaintiff identified herself and provided information to Defendant to support her dispute.

68. Plaintiff specifically disputed the inaccurate reporting of the expired license.

69. Plaintiff specifically asked Defendant to investigate and correct its reporting in any consumer report about Plaintiff.

**Defendant's Unreasonable Investigation of the Dispute**

70. Upon information and belief, SambaSafety received the March 15, 2026 dispute.

71. Upon information and belief, SambaSafety did not perform a reasonable reinvestigation but instead relied on the information already in its system, verifying inaccurate information.

72. SambaSafety did not, upon information and belief, actually review the underlying North Carolina or South Carolina driving records or SCDMV data to confirm that Plaintiff's license was *actually expired* – it was not.

73. Again, upon information and belief, SambaSafety did not perform a reasonable reinvestigation but instead relied on the information already in its system, verifying inaccurate information.

**Defendant SambaSafety Responds to the Plaintiff's Dispute**

74. On or about March 16, 2026, Plaintiff received an email response from SambaSafety which stated; "Upon attempting to locate a dispute case for you to begin the reinvestigation process, we were unable to locate any. Can you please submit a dispute at www.safetyholdingsinc.com?"

75. This response was maddening for Plaintiff, but she persisted in trying to solve her issues.

**Plaintiff Submits a Second Dispute to Defendant**

76. On March 21, 2026, Plaintiff submitted another dispute to SambaSafety through their portal.

77. Plaintiff received confirmation that her dispute was received on March 22, 2026.

**Defendant Investigates Plaintiff's Second Dispute and Responds to Plaintiff**

78. Upon information and belief, SambaSafety performed a reinvestigation and reviewed the underlying records from South Carolina and North Carolina.

79. On April 28, 2026, Plaintiff received a dispute response from SambaSafety.

80. The response identified that "Uber recently attempted to obtain your South Carolina MVR; however, during that request, Uber transposed the driver's license number and added several leading zeros. As a result, the request corresponded to a North Carolina driver's license number, leading to an incorrect MVR return for a different consumer."

81. Defendant also stated it had notified Uber of the identified input error and its findings.

82. However, the dispute response still stated that, unless Defendant received a new request from Uber, Defendant could not conduct a new MVR search.

83. Upon information and belief, SambaSafety never corrected the report, nor did it create a new report in response to Plaintiff's dispute, in violation of the FCRA.

**Plaintiff Requests a New Copy of Her MVR**

84. After receiving the dispute response, Plaintiff requested a new copy of her MVR from SambaSafety following her dispute.

85. On May 21, 2026, SambaSafety only sent Plaintiff a copy dated "March 20, 2025", which was a much older MVR background check it had completed with Plaintiff's license without issues over a year prior.

86. Plaintiff never received a new copy of her corrected MVR from Defendant.

**Uber Orders an MVR from non-party Checkr**

87. On May 6, 2026, Uber ordered an MVR on Plaintiff from non-party Checkr, not Defendant.

88. On May 6, 2026, Checkr completed Plaintiff's MVR and published it to Uber with the correct information.

89. Accordingly, on or around May 16, 2026, Plaintiff's Uber account was reactivated, and Plaintiff was finally able to work for Uber again.

**SambaSafety Never Issued a New Report**

90. Upon information and belief, SambaSafety never issued a new report, corrected its old report, or changed its report it provided to Uber in any way.

**Results of the Defendant's Failures**

91. As of the date of filing, SambaSafety still refuses to update Plaintiff's consumer report, showing that she has an active driver's license.

92. The "expired" status of Plaintiff's driver's license reported by Defendant is completely inaccurate.

93. Plaintiff had, and currently has, an active, valid driver's license.

94. A cursory review of the widely available motor vehicle records confirms that Plaintiff driver's license was never expired and the expired notation belonged to a completely different consumer. Defendant admits to this in its dispute response, yet refused to correct it and send an updated report to Uber.

95. Defendant does not have a procedure in place to initiate a review of a consumer's report before publishing it to its customer Uber when the personal identifying information of the consumer returned **does not match any** of the personal identifying information of the subject of the report, as happened here.

96. The sole reason the inaccurate "expired" driver's license status was reported on the consumer report concerning Plaintiff was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the consumer report it sold about Plaintiff to Uber.

97. Had Defendant followed reasonable procedures, it would have discovered that Plaintiff's driver's license was never expired and would not have reported the same.

98. In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Uber inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b)

99. Plaintiff's Uber account was reactivated, but not before Plaintiff lost out on necessary income for nearly three months.

100. About a month before the inaccurate report by Defendant, Plaintiff was hospitalized and was unable to drive for a week. Plaintiff was attempting to catch up on income when Defendant inaccurately reported her license as invalid. Plaintiff got behind on her rent and car payments.

101. Plaintiff is now living with a friend because of this entire issue; it created a downward spiral that she is still trying to recover from.

102. As a result of deactivation and loss of income, Plaintiff also had to borrow hundreds of dollars from her daughter to cover basic necessities, causing a natural strain in their relationship.

103. The incident also caused substantial emotional distress. Plaintiff experienced anxiety, stress, and confusion stemming from the false implication that her license was expired and that she could not get the necessary income to meet her basic needs.

104. Plaintiff felt embarrassed and concerned that the situation reflected some sort of wrongdoing on her part. The financial uncertainty further compounded her stress, as she wholly depends on supplemental income from Uber to maintain her basic needs.

105. Plaintiff also experienced fear that the inaccurate information could affect future employment opportunities, particularly given her age and limited flexibility for alternative work.

106. Physically, the stress manifested in headaches and sleep disruption. Plaintiff was unable to sleep for several days immediately following her account deactivation, as she worried about her financial situation and the lack of resolution.

107. Plaintiff is 62 years old and has a blood pressure issue that requires medication. During the time she was deactivated, she was unable to afford her prescribed blood pressure medication, negatively impacting her health.

108. Plaintiff also spent a considerable amount of time attempting to resolve the issue. She repeatedly contacted Uber support, monitored the app for updates, and followed up on her case, spending an estimated six hours per day over a period of approximately two and a half weeks. This effort represents a significant burden and further contributed to her distress.

109. But for Defendant's inaccurate consumer report, Plaintiff would have continued to work as an Uber driver, and Plaintiff would have been spared the humiliation, embarrassment, and stress imposed upon Plaintiff to correct Defendant's erroneous reporting.

110. Defendant's false report cost Plaintiff a well-paying, flexible job and ability to earn income through the Uber platform for months.

111. Due to Defendant's unreasonable procedures and shoddy, if any, dispute reinvestigation, and despite Plaintiff's continued efforts, as of the date hereof, Plaintiff missed out on months of income from Uber.

112. The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

113. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of income; loss of employment opportunities with a company she has worked for over six years, nearly three months' wages, and benefits; loss of economic opportunities; loss of time and money trying to correct her

background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; health deterioration, including headaches and abnormal blood pressure,; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

## CLAIMS FOR RELIEF

## COUNT I

## 15 U.S.C. § 1681e(b)

## Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

114. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

115. Defendant is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

116. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

117. At all times pertinent hereto, the above-mentioned consumer report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

118. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the consumer report it sold about Plaintiff as well as the information it published within the same.

119. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities with a company she has worked for over six years, nearly three months' wages, and benefits; loss of economic opportunities; loss of time and money trying to correct her background check

report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; health deterioration, including headaches and abnormal blood pressure; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

120. Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

121. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**

122. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

123. The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id*.

124. The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the

accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

125. On at least one occasion, Plaintiff disputed the inaccurate information with Defendant and requested that Defendant correct the inaccurate information in the consumer report that is patently inaccurate, misleading, and highly damaging to her, namely, stating that she had an expired driver's license.

126. In response to Plaintiff's dispute, Defendant failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in the consumer report and refused to correct the consumer report at issue.

127. Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate; by failing to correct the disputed inaccurate information from the subject consumer report; by failing to follow reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file; and by relying upon verification from a public source it has reason to know is unreliable.

128. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities with a company she has worked for over six years, nearly three months' wages, and benefits; loss of economic opportunities; loss of time and money trying to correct her background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; health deterioration, including headaches and abnormal blood

pressure; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

129. Defendant willfully violated 15 U.S.C. § 1681i in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

130. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that Defendant negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

//

RESPECTFULLY SUBMITTED this 17th day of August 2026.

*/s/ Dawn McCraw*
Dawn McCraw (Fed ID No. 13710)
Consumer Justice Law Firm PLC
8095 N 85th Way
Scottsdale, AZ 85258
T: (602) 807-1527
F: (480) 613-7733
E: dmccraw@consumerjustice.com

*Attorneys for Plaintiff*
*Karen Lynette Rainey*